IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


MARIO JOHNSON,

                  Plaintiff,

        v.

LINDSAY NOACK, personal and official
capacities; LYNN HUST, personal and official
capacities; MATTHEW GUSHARD, personal
and official capacities; TRACY JOSEPH,
personal and official capacities,

                  Defendants.

Case No. 3:16-cv-00443-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

      Mario Johnson ("Plaintiff"), a self-represented litigant, brings this 42 U.S.C. § 1983

action against four Oregon Department of Corrections ("ODOC") employees—Lindsay Noack

("Noack"), Lynn Hust ("Hust"), Matthew Gushard ("Gushard"), and Tracy Joseph ("Joseph")

(collectively, "Defendants"). Plaintiff asserts constitutional and state law claims against

Defendants based on actions they took during the period Plaintiff was incarcerated at ODOC

institutions. All parties consent to the jurisdiction of a U.S. Magistrate Judge pursuant to FED. R.

CIV. P. 73(b). (ECF No. 44.) Defendants now move for summary judgment on Plaintiff's claims

pursuant to FED. R. CIV. P. 56. (ECF No. 54.) The Court has jurisdiction over this matter

pursuant to 28 U.S.C. § 1331. For the reasons explained below, the Court grants Defendants'

motion for summary judgment.

## BACKGROUND[1]

Plaintiff entered ODOC custody on October 7, 2014, and was initially housed at Coffee

Creek Correctional Facility ("CCCF"). On October 30, 2014, Plaintiff transferred to the

Columbia River Correctional Institution ("CRCI"). (*See* Dorgan Decl. Att. 1 (listing Plaintiff's

ODOC housing history).)

### Skin Search Incident

On December 5, 2014, Plaintiff went through a medication line in a common area of

CRCI. (Joseph Decl. ¶ 8.) Joseph, a correctional officer at CRCI, supervised the medication line.

(Joseph Decl. ¶ 7.) One of her duties was to ensure prisoners take their medication rather than

hide them to stash or barter. (*Id.*) During his inspection, Plaintiff kept sticking his tongue out and

down rather than up as instructed by Joseph. (Joseph Decl. ¶ 8.) He complied after several

orders. (*Id.*) After Plaintiff turned around, Joseph saw Plaintiff bring a hand to his mouth and

then to his pocket. (*Id.*) She ordered him to take his hands from his pockets and tuck in his shirt

so his pockets were visible. (*Id.*) He refused multiple times, even after Joseph said she would

request a skin search. (*Id.*) Joseph then contacted intake staff to skin search Plaintiff. (*Id.*) She

later submitted a memo to Michael Lange, who was shift lieutenant that day, describing the

incident. (Joseph Decl. Att. 2.) Plaintiff denies lowering his hands below his chest, reaching into

his pockets, and refusing to tuck in his shirt. (Johnson Decl. at 6-7.)

---

[1] Unless otherwise noted, the following facts are either undisputed or viewed in the light
most favorable to Plaintiff.

Thomas Hayes ("Hayes"), a correctional officer at CRCI, heard Joseph's skin-search request on his radio. (Hayes Decl. ¶ 5.) He found Plaintiff "acting very agitated and unsettled" in the corridor. (*Id.*) He directed Plaintiff to the intake area, and eventually placed Plaintiff in the center unclothed search booth with the curtain closed. (Hayes Decl. ¶ 6.) Plaintiff was "agitated and argumentative" during this process. (*Id.*) Hayes found one prescription pill in Plaintiff's pants pocket. (Hayes Decl. ¶ 7.) The pill matched those in a blister pack of medication prescribed to Plaintiff. (*Id.*)

Plaintiff ignored Hayes' orders to finish getting re-dressed. (Lange Decl. ¶ 5.) Sergeant Moore ("Moore") (first name unknown), the shift sergeant who was in the intake area outside the booth, ordered Plaintiff to turn around so he could be restrained. (Lange Decl. ¶ 6.) Plaintiff did not comply, so Moore called for first responders. (Lange Decl. ¶¶ 6-7.) Siegel, a female officer and designated first responder, reported to the intake area.[2] (Lange Decl. ¶ 8.) Plaintiff "became argumentative and began waving his arms to make his point." (*Id.*) Moore, Siegel, and Hayes entered the search booth and together forcefully restrained Plaintiff, who was later placed in the disciplinary segregation unit ("DSU"). (*Id.*)

The following day, October 6, 2014, Plaintiff received a misconduct report for violating two Inmate Rules of Prohibited Behavior: Rules 1.11 (Contraband I) and 4.01 (Disobedience of an Order I). (Lange Decl. Att. 2, at 6.) On December 17, 2014, a disciplinary hearing was held regarding the skin search incident. (Nofziger Decl. ¶ 6.) Plaintiff acknowledged receiving a copy of the misconduct report, notices of the hearing and his rights at the hearing, and the Inmate Rules of Prohibited Behavior. (*Id.*) He also acknowledged understanding the misconduct report

---

[2] Plaintiff claims he was strip-searched "in the presence of several female officers[,]" not just Siegel. (Am. Compl. at 10.)

and his rights at the hearing. (*Id.*) The hearings officer heard testimony and found Plaintiff guilty of violating Rules 4.01 (Disobedience of an Order I) and 1.12 (Contraband II). (*Id.*) The hearings officer did not find evidence sufficient to support a violation of Rule 1.11 (Contraband I), as initially charged. (*Id.*) Plaintiff received a sanction of thirteen days in the DSU and seven days' loss of privileges upon release therefrom. (*Id.*)

## Transfer Incident

On January 7, 2015, Plaintiff was transferred to Multnomah County for court proceedings. (Dorgan Decl. ¶ 6.) Upon Plaintiff's return to CRCI on January 14, 2015, Multnomah County transport staff reported twice having to use a Taser on Plaintiff, who reportedly was disruptive during the trip. (Dorgan Decl. ¶ 7.) Upon return, Plaintiff was administratively segregated in the DSU. (*Id.*)

On January 15, 2015, a multi-disciplinary team ("MDT") comprising staff from all operational departments at CRCI met to review the status of prisoners assigned to special housing units. (Dorgan Decl. ¶ 9.) MDT recommended that Plaintiff remain in the DSU until paperwork regarding the January 14, 2015, incident arrived from Multnomah County, and that Plaintiff be transferred to another facility. (Dorgan Decl. ¶ 10.) A request that Plaintiff be transferred to the Oregon State Penitentiary ("OSP") was made on January 21, 2015. (Dorgan Decl. Att 4.) MDT met again on January 22, 2015, but did not change its recommendation. (Dorgan Decl. ¶ 13.) The ODOC Office of Population Management ("OPM") approved the transfer. (Dorgan Decl. ¶ 14.) On January 23, 2015, Plaintiff transferred to OSP, where he remained administratively segregated until January 29, 2015. (Dorgan Decl. ¶ 15.)

On February 20, 2015, Plaintiff transferred to the Oregon State Correctional Institution ("OSCI"). (Dorgan Decl. Att. 1.)

**Cell Search Incident**

On May 15, 2015, Alves ("Alves") (first name unknown) went to Plaintiff's cell, which he had been instructed to search for unauthorized envelopes. (Gushard Decl. Att. 8.) Plaintiff was in his cell, and Alves ordered him to leave. (*Id.*) Plaintiff was hostile, so Alves ordered Plaintiff to go to the officer's area. (*Id.*) Plaintiff left and returned a few minutes later, saying he wanted to watch the search. (*Id.*) Alves repeatedly ordered Plaintiff to leave, and Plaintiff repeatedly refused, "becoming more aggressive in his refusals." (*Id.*) Alves called for staff assistance. (*Id.*) When staff arrived, Alves ordered Plaintiff to submit to restraints. (*Id.*) Plaintiff "refused and postured as if he was going to fight with staff."[3] (*Id.*) Plaintiff submitted to restraints after Alves pulled out his pepper spray and threatened to use it. (*Id.*) Plaintiff was later placed in segregation. (*Id.*)

The next day, May 16, 2015, Plaintiff received a misconduct report for violating two Inmate Rules of Prohibited Behavior: Rules 1.11 (Contraband II) and 4.01 (Disobedience of an Order I). (Nofziger Decl. Att. 2, at 3.) A disciplinary hearing regarding the cell search incident took place on May 20, 2015. (*Id.* at 1.) Plaintiff acknowledged receiving a copy of the misconduct report, notices of the hearing and his rights at the hearing, and the Inmate Rules of Prohibited Behavior. (*Id.*) He also acknowledged understanding the misconduct report and his rights at the hearing. (*Id.*) The hearings officer heard testimony and found that Plaintiff had violated Rule 4.01 (Disobedience of an Order), but dismissed the Rule 1.11 violation

---

[3] Plaintiff denies being aggressive toward Alves and staff. (Johnson Decl. at 20 ("I felt that I hadn't done anything wrong but calmly express[ed] that the search was being wrongfully conducted.").)

(Contraband II).[4] (*Id.*) Plaintiff received a sanction of fourteen days in the DSU and fourteen days' loss of privileges upon release therefrom. (*Id.* at 2.)

### Cell Block Incident

On May 27, 2015, Plaintiff transferred back to OSP. (Dorgan Decl. Att. 1.) He spoke to Sergeant Hollman ("Hollman") (first name unknown) on June 5, 2015, about having sleep apnea and snoring, which was keeping his cellmate and others awake. (Nofziger Decl. Att. 3, at 3.) Hollman gave Plaintiff a couple of suggestions, and Plaintiff said, "I cannot go back to the block."[5] (*Id.*) Hollman asked whether Plaintiff was refusing to "cell in." (*Id.*) When Plaintiff did not immediately respond or move toward his cell block, Hollman placed Plaintiff in wrist restraints and escorted him to the DSU. (*Id.*)

On June 11, 2015, a disciplinary hearing regarding the cell block incident was held. (Nofziger Decl. Att. 3, at 1-2.) Plaintiff acknowledged receiving a copy of the misconduct report, notices of the hearing and his rights at the hearing, and the Inmate Rules of Prohibited Behavior. (*Id.*) He also acknowledged understanding the misconduct report and his rights at the hearing. (*Id.*) The hearings officer heard testimony and found that Plaintiff had violated Rule 4.01 (Disobedience of an Order I) and Rule 4.40 (Unauthorized Area I). (*Id.*) Plaintiff received a sanction of seven days in the DSU and seven days' loss of privileges upon release therefrom. (*Id.*)

---

[4] During the hearing, Plaintiff testified that the five unauthorized envelopes found in his cell were indigent envelopes he received while housed at Multnomah County Jail. Plaintiff did not know they were unauthorized; he had the envelopes at OSP; his envelopes were not taken when his property was searched; and the inmate handbook did not state that envelopes must be purchased from the prison canteen. (*Id.*)

[5] Plaintiff alleges he refused to return to his cell block because he feared being harmed by other prisoners. (Johnson Decl. at 21.)

On October 15, 2015, Plaintiff was released to post-prison supervision. (Erickson Decl. ¶ 3.) He filed this action on March 11, 2016. (ECF No. 2.)

## ANALYSIS

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## II.     DISCUSSION

### A.      42 U.S.C. § 1983 Claims

#### 1.      Access to Courts

##### a.      Introduction

At the heart of Plaintiff's amended complaint are his allegations that, in various ways, he was denied his right of access to courts, a First Amendment right subsumed under the right to petition the government for redress of grievances. *Perry v. Barton*, No. C 92-2339 BAC, 1994 WL 374551, at *2 (N.D. Cal. June 29, 1994). The right of access to courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."

*Bounds v. Smith*, 430 U.S. 817, 828 (1977). However, "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). As such, "the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

### b. Plaintiff's Allegations

Plaintiff bases his access-to-courts claim on several events that allegedly took place at CRCI and OSCI.

### i. CRCI

First, Plaintiff claims that at CRCI his "saved legal work was partially deleted or in some cases entirely deleted from [his] assigned thumb drive that was left in the custody of the library clerk, Defendant Ms. Hust." (Am. Compl. at 9.) He further claims Hust called him to the library and asked why he needed certain legal material on his thumb drive and then "proceeded to delete the legal information in its entirety." (*Id.*) Second, Plaintiff claims he was "denied [his] legal reference books[,] legal documents, and communication with [his] family court attorney" during his first stay in solitary confinement. (Am. Compl. at 10.) Third, Plaintiff claims his "written request[s] for access to the law library were being disregarded." (*Id.*) He further claims that, after filing a grievance, his access was "eventually reinstated, but the time allowed was discriminately limited and [his] activities were highly monitored and censored." (*Id.*) Fourth, Plaintiff claims that during his second stay in solitary confinement at CRCI he was again denied contact with his

family court attorney, who was attempting to contact him regarding "imminent deadlines and other pending legal matters[.]" (Am. Compl. at 11.)

### ii.    OSCI

Fifth, Plaintiff claims that at OSCI he was subjected to a policy that "infringed on inmates['] right to meaningful access to legal material and copy services." (Am. Compl. at 13.) The policy, as Plaintiff describes it, requires prisoners to save certain legal information on assigned thumb drives, and "then the library clerk would print the information to be given to the inmate but not before the information was thoroughly reviewed and censored."[6] (Am. Compl. at 14.) Plaintiff alleges that Gushard "was the law library clerk who reviewed and censored inmates['] legal material." Plaintiff claims that Gushard refused to "deviate from the rigid, unconstitutional policy" by allowing him legal information needed for "imminent filing deadlines," physically assaulted Plaintiff, and then "apologized the next day, stating 'he recognized that denial of the legal material is legally arbitrary but he is only following orders from up above.'" (Am. Compl. at 14-15.)

Sixth, Plaintiff claims that he "attempted to circumvent the situation" by conducting his legal work from his cell and that, as a result, Gushard sent a correctional officer to his cell to seize his legal reference books and legal documents.[7] (Am. Compl. at 15.) Seventh, Plaintiff claims the officer looked through his legal documents and ordered him to leave the cell block.

---

[6] Plaintiff takes issue with the limits on what material may be saved to assigned thumb drives because the "legal research database accessible to the inmates is a controlled system and there is no reason for D.O.C. staff to believe that inmates could obtain information that would be a threat to the security of the prison. The obvious reason for the intrusive policy is to suppress the liability exposure of D.O.C." (Am. Compl. at 14.)

[7] In his declaration in support of his amended response, Plaintiff alleges that Gushard seized legal reference books from Plaintiff's cell on multiple occasions. (ECF No. 72-1 at 19.)

(*Id.*) Eighth, Plaintiff claims that, after a stay in solitary confinement and a transfer to OSP following the cell-search incident, his legal documents were returned but "some of the material evidence relating to D.O.C. [was] missing." (Am. Compl. at 16.)

In his declaration in support of his amended response (ECF No. 72-1), Plaintiff raises several additional issues regarding law libraries at ODOC facilities.[8] He complains generally that he had to use three-inch pencils and carbon paper to transcribe his research materials, and prison officials do not provide prisoners enough time in the library for identifying, analyzing, and transcribing by hand. (Johnson Decl. at 2.) He also complains that there are too few legal assistants, assistants are often too busy to help, and there is a backlog of requests for appointments with assistants. Furthermore, legal assistants do not draft complaints and motions for prisoners, who must do their own drafting. (Johnson Decl. at 3.) Plaintiff also makes a handful of specific complaints: namely, that his legal documentation from CRCI was seized when he was transferred, and he had to start over at OSCI (Johnson Decl. at 16); OSCI's law library policy that word processors cannot be used for tort suits, soliciting an attorney, or for § 1983 suits is unconstitutional (Johnson Decl. at 17); and that Gushard censors legal information that could be used against ODOC or other state entities (Johnson Decl. at 18).

### c. Analysis

"Where a prisoner asserts a backward-looking denial of access claim—one, as here, seeking a remedy for a lost opportunity to present a legal claim—he must show: 1) the loss of a 'nonfrivolous' or 'arguable' underlying claim; 2) the official acts frustrating the litigation; and 3)

---

[8] To the extent these are new arguments made for the first time in his response to the pending motion for summary judgment, the Court declines to address them individually. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 965 (9th Cir. 2006) (finding that a district court need not address allegations raised for the first time in a response to a motion for summary judgment where the plaintiff's "pleadings did not provide sufficient notice of those allegations").

a remedy that may be awarded as recompense but that is not otherwise available in a future suit."
*Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir. 2007) (quoting *Christopher v. Harbury,* 536 U.S.
403, 413-14 (2002)), *judgment vacated on other grounds*, 555 U.S. 1150 (2009). Plaintiff cannot
succeed on any of his access-to-court claims because he has failed to identify any actual injury
caused by any such alleged constitutional deprivation. *See Lewis*, 518 U.S. at 351 (requiring
more to establish actual injury than alleging that a prison law library is "subpar in some
theoretical sense").

In his amended complaint, Plaintiff alleges that his petition for post-conviction relief was
procedurally defaulted, and that his parental rights were terminated, as a result of the alleged
constitutional deprivations. (Am. Compl. at 17.) Plaintiff restates similar allegations in his
amended declaration. (Johnson Decl. at 2, 10-11.) However, Plaintiff has submitted no
explanation, or evidence, tying any alleged lack of access to his legal materials to the loss of any
specific claim.[9]

Plaintiff's vague statements are not enough to demonstrate an actual injury that *resulted
from* the alleged constitutional deprivations, which is fatal to his claims.[10]

_____

[9] In any event, the right of access to courts does not apply to family court proceedings.
*See Lewis*, 518 U.S. at 354 (observing that the right extends only to appeals of convictions for
which prisoners are incarcerated, habeas corpus proceedings, and civil rights actions to vindicate
basic constitutional rights). Furthermore, Plaintiff was represented by counsel in family court.
(Am. Compl. at 11.) Prison officials had no further obligation to provide Plaintiff access to
courts. *See Lindquist v. Idaho St. Bd. of Corr.*, 776 F.2d 851, 955 (9th Cir. 1985) (holding that "a
prison must provide inmates with access to an adequate law library or, *in the alternative*, with
adequate assistance from persons trained in the law") (emphasis in original).

[10] Furthermore, to the extent Plaintiff challenges ODOC's library policies (Am. Compl. at
6), Plaintiff was released from the custody of ODOC in 2015 and therefore his claims for
prospective relief, either injunctive or declaratory, are moot because he "is no longer subject to
the prison conditions or policies he challenges." *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir.
2012).

## 2.    Procedural Due Process

Plaintiff alleges that he was denied his right to procedural due process with respect to three periods in solitary confinement and three transfers between ODOC institutions.

Plaintiff must have a liberty interest to be entitled to procedural due process. That interest may be found in either the Due Process Clause of the Fourteenth Amendment or in state law. *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). With respect to prison conditions, the now well-settled inquiry is whether prison conditions "impose[] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). The *Sandin* Court considered three factors in making its determination: (1) whether the conditions in disciplinary segregation mirrored those in administrative segregation and protective custody; (2) whether the confinement exceeded similar, discretionary confinement in terms of duration or degree of restriction; and (3) whether "the State's action will inevitably affect the duration of [the prisoner's] sentence." *Id.* at 486-87. If a liberty interest is found, pursuant to either the Due Process Clause or state law, the remaining question is whether Plaintiff received the amount of process he was due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (". . . once it is determined that the Due Process Clause applies, the question remains what process is due.").

### a.    Solitary Confinement

Plaintiff has no liberty interest under the Due Process Clause in avoiding disciplinary segregation. Time in disciplinary segregation is the type of condition ordinarily contemplated by Plaintiff's sentence. *See May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (finding no liberty interest in avoiding placement in disciplinary segregation before a disciplinary hearing). Thus,

Plaintiff has no liberty interest under the Due Process Clause itself and must look for a state-created interest.

Plaintiff was placed in disciplinary confinement on three occasions, for durations of thirteen, fourteen, and fifteen days, and in administrative confinement on one occasion, for a duration of fifteen days. District courts in the Ninth Circuit have held that segregation from forty days to two-and-a-half years in duration does not impose an atypical and significant hardship giving rise to a protected liberty interest. *See LaFleur v. Nooth*, No. 2:12-cv-00637-SI, 2014 WL 1236138, at *4-5 (D. Or. Mar. 25, 2014) (collecting cases). The Ninth Circuit has more recently held that a twenty-seven month stay in solitary confinement without any meaningful review "imposed an atypical and significant hardship under any plausible baseline." *Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014). By contrast, Plaintiff's longest stay in segregation was fifteen days. Thus, the duration of Plaintiff's time in segregation did not impose an atypical and significant hardship giving rise to a protected liberty interest.

Other than duration, the only conditions of confinement that Plaintiff alleges were atypical were the conditions in disciplinary segregation following the skin-search incident. Regarding that incident, Plaintiff complains that his cell was small, his only human contact was with the guards during meals and when doing their rounds, and his only time out of isolation was once a week for a ten-minute shower. (Johnson Decl. at 9.) Those are typical solitary confinement conditions, and do not rise to the level of an atypical hardship when experienced for a short duration. *See Chappell*, 706 F.3d at 1063 ("Only the most extreme changes in the conditions of confinement have been found to directly invoke the protections of the Due Process

Clause, such as involuntary commitment to a mental institution or the forced administration of psychotropic drugs.") (internal citations omitted).[11]

In any event, Plaintiff has also failed to demonstrate that any named individual defendant was involved in the initiation or continuation of his placement in administrative or disciplinary segregation. Joseph's only involvement in the skin-search incident leading to the first period of segregation was ordering the skin search. Hayes conducted the search, Moore came to his aid when Plaintiff would not follow orders or submit to restraints, and Moore (not a defendant) submitted the misconduct report prompting the disciplinary proceedings. (Nofziger Decl. Att. 1, at 1.) No defendant was involved in the transport incident leading to the second period of segregation. Plaintiff was segregated after Multnomah County staff reported that Plaintiff was so disruptive during transport that he was tased twice. (Dorgan Decl. ¶ 7.) No defendant was involved in the cell-search incident leading to the third period of segregation. Alves (not a defendant) conducted the search and submitted the misconduct report. (Nofziger Decl. Att. 1, at 1.) Finally, the fourth period of segregation was at OSP (Nofziger Decl. ¶¶ 10-12, Att. 3), and all of the named Defendants worked at OSCI or CRCI. (Gushard Decl. ¶ 1; Hust Decl. ¶ 1; Joseph Decl. ¶ 1; Noack Decl ¶ 1.) Because Defendants were not involved in the alleged deprivations of Plaintiff's due process rights, they cannot be held liable under § 1983. See *Jones v. Williams*, 297

---

[11] The Supreme Court has held that "[s]egregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions." *Hughes v. Rowe*, 449 U.S. 5, 11 (1980) (citing *Hayes v. Walker*, 555 F.2d 625, 633 (7th Cir. 1977)). However, the Misconduct Reports for two of the three incidents resulting in Plaintiff's placement in disciplinary segregation include statements from the officers-in-charge that prehearing segregation was required because Plaintiff posed a threat to institutional safety and security (the officer-in-charge's statement on the third Misconduct report was illegible). Furthermore, although Plaintiff did not receive a hearing before he was placed in administrative segregation, such a hearing is not required under the applicable Oregon Administrative Rules. *See* OR. ADMIN. R. 291-046-0025 & 291-046-0030 (requiring only post-segregation hearings and only where the involuntary placement exceeds thirty days).

F.3d 930, 934 (9th Cir. 2002) (for liability to attach, "there must be a showing of personal participation in the alleged rights deprivation"). As such, Defendants are entitled to summary judgment on Plaintiff's due process claim based on his stays in solitary confinement.

### b.    Transfers

For the same reasons, Defendants are entitled to summary judgment on Plaintiff's due process claim based on his transfers between ODOC facilities. Plaintiff was transferred on three occasions: from CRCI to OSP on January 23, 2015; from OSP to OSCI on February 20, 2015; and from OSCI back to OSP on May 27, 2015. (Dorgan Decl. ¶ 3, Att. 1.) Plaintiff alleges that each transfer was a punishment because he was a minimum-security prisoner, and OSP and OSCI are maximum and medium-security institutions, respectively, whereas CRCI, Plaintiff's original placement, is a minimum-security institution. (Am. Comp. at 11, 13 & 16.)

It is well settled that "the Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another within the state prison system." *Meacham v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Due Process Clause does not require pre-transfer hearings).[12] Nor has Plaintiff alleged facts sufficient to demonstrate that his assignment to OSP or OSCI posed a significant and atypical hardship in relation to the ordinary incidents of prison life. He has provided no facts regarding the conditions of confinement at OSP or OSCI as compared to CRCI with which the Court could engage in the *Sandin* analysis, nor has he alleged that the transfers lengthened his term of incarceration. *See Thomasson v. Premo*, No. 6:14-CV-01788-MO, 2017 WL 2403565, at *6 (D. Or. June 2, 2017) (declining to find that conditions at one institution were harsher than those at another where

---

[12] Similarly, the Ninth Circuit has held that prisoners have no due process right to a particular classification status. *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987).

plaintiff "failed to allege any facts to support that belief"), *appeal dismissed*, No. 17-35536, 2017 WL 4404728 (9th Cir. Aug. 28, 2017).

In any event, Plaintiff has also failed to allege that he received insufficient process before his transfers or that Defendants were responsible for the amount of process he received. Plaintiff's first transfer, from CRCI to OSP, was approved by OPM, which makes final decisions regarding prisoner transfers. (Dorgan Decl. ¶ 14.) The transfer was first recommended by MDT, which reviews the status of all prisoners in special housing. (Dorgan Decl. ¶¶ 4, 9; Noack Decl. Att. 3, at 7.) Plaintiff was administratively segregated on January 14, 2015, following the tasing incident during his return transfer from Multnomah County court proceedings to CRCI. (Dorgan Decl. ¶ 7.) MDT reviewed Plaintiff's status the next day, January 15, 2015, and recommended that Plaintiff's "behavior made him a security risk for continued placement at CRCI, and that security risk was best mitigated by transferring [him] to another facility. . . ." (Dorgan Decl. ¶¶ 9-12.) A transfer request was made January 21, 2015, and MDT met again on January 22 and did not change its recommendation. (Dorgan Decl. ¶ 13, Att. 3, 4.)

Plaintiff alleges that Noack visited him in his cell and told him he was being transferred to OSP because he was a problem. (Am. Compl. at 11.) He does not allege any other involvement by her or any other defendant. For example, he does not allege that any defendant participated in the MDT meetings, was a member of OPM, or made recommendations to either body. The record is silent as to the proceedings leading to Plaintiff's later two transfers, from OSP to OSCI and back; however, Plaintiff does not allege defendant involvement, nor could he because no named defendant worked at OSP. (Hust Decl. ¶ 1; Joseph Decl. ¶ 1; Noack Decl ¶ 1.) Gushard worked at OSCI (Gushard Decl. ¶ 1), but his only alleged involvement in Plaintiff's transfer from that institution is ordering a cell search that led to a misconduct incident, which

resulted solitary confinement and then a transfer. (Am. Compl. at 15-16.) Such indirect

"involvement" does not give rise to liability under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662,

676 (2009) (stating that § 1983 "plaintiff[s] must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution"). Plaintiff has not

demonstrated an issue of material fact regarding Defendants' involvement in his transfers.

Therefore, Defendants are entitled to summary judgment on Plaintiff's transfer-based due

process claims.

### 3.  Eighth Amendment

Plaintiff brings an Eight Amendment claim without tying it to any of the allegations in

his complaint. The allegations that could implicate the Eighth Amendment are those regarding

Plaintiff's general conditions of confinement and the failure of prison officials to protect him

from harm caused by other prisoners. Neither constitutes cruel and unusual punishment under the

circumstances alleged here.

Plaintiff must meet two requirements to hold a prison official constitutionally liable under

the Eighth Amendment's Cruel and Unusual Punishments Clause. The first requirement is

objective: the alleged deprivation must be "sufficiently serious[.]" *Farmer v. Brennan*, 511 U.S.

825, 834 (1994) (internal quotation marks omitted). When the deprivation is based on the

prisoner's conditions of confinement, this standard may be met by showing that the conditions

"deprive[d] inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*,

452 U.S. 337, 347 (1981). When the deprivation is based on a prison official's failure to protect a

prisoner, this standard may be met by showing that the "conditions pos[ed] a substantial risk of

serious harm." *Farmer*, 511 U.S. at 834. The second requirement is subjective: the "prison

official must have a sufficiently culpable state of mind." *Id.* Such a sufficiently culpable state of

mind is one of "deliberate indifference to inmate health or safety." *Id.* (internal quotation marks

omitted). The test for such deliberate indifference is whether the prison official "knows that

inmates face a substantial risk of serious harm and disregards that risk by failing to take

reasonable measures to abate it." *Id.* at 837. Stated another way, "the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference." *Id.*

### a.        Conditions of Confinement

Plaintiff's cruel and unusual punishment claim based on the conditions of his

confinement cannot survive summary judgment. Plaintiff fails to identify any conditions that

amount to deprivations of the minimal civilized measure of life's necessities, and he fails to

attribute his conditions of confinement to any specific defendant. Thus, Plaintiff cannot maintain

an Eighth Amendment violation based on his conditions of confinement.

### b.        Failure to Protect

Plaintiff's failure to protect claim cannot survive summary judgment for the same reason.

Plaintiff alleges that, despite his classification as a minimum-security inmate, he was "released to

the main population" at OSP, where he was "assaulted several times by other inmates" and

"endured for a[n] extended period of time, without having the option for protective custody."

(Am. Compl. at 12.) Even assuming that these allegations are true, Plaintiff fails to connect these

allegations to any specific defendant. To the extent he blames Defendants for their alleged role in

his transfer to OSP, the connection to any assaults Plaintiff endured while housed there is too

tenuous to demonstrate that Defendants knew he was at a substantial risk for serious harm at the

hands of other prisoners and failed to take reasonable measures to avoid such a risk. Plaintiff

cannot sustain his Eighth Amendment claims.

### 4.        Fourth Amendment

Plaintiff asserts a violation of his Fourth Amendment right to be free from unreasonable searches and seizures. He complains that he was "strip searched and humiliated in the presence of several female officers." (Am. Compl. at 10.) Plaintiff also claims that defendant Gushard took library books from his cell and that another correctional officer looked through the legal documents in his cell and seized "material evidence[.]" (Am. Compl. at 15-16.)

The Fourth Amendment proscribes unreasonable searches and seizures only. *Carroll v. U.S.*, 267 U.S. 132, 147 (1925). "The test of reasonableness . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

### a.        Skin Search

Skin or strip searches of male prisoners in the view of female officers may or may not be reasonable, depending on the circumstances. For example, the Ninth Circuit upheld a prison policy where female officers sometimes viewed male prisoners while undressed and routinely performed pat-down searches not involving intimate bodily contact. *Grummett v. Rushen*, 779 F.2d 491, 493, 495-96 (9th Cir. 1985) (reasoning that the observations were "restricted by distance" and "casual in nature" and that the pat-downs were "brief and while the inmates were fully clothed"); s*ee also Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988) (upholding routine strip searches conducted outside prisoners' cells where they could be viewed by female officers). However, "[c]ourts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances." *Byrd v.*

*Maricopa Cty. Sheriff's Dep't.*, 629 F.3d 1135, 1143 (9th Cir. 2011). In *Byrd*, the Ninth Circuit found unreasonable a strip search by a female officer of a male prisoner where the prisoner was almost completely unclothed, the officer touched his genitals through thin boxer shorts, there was no emergency, there were onlookers, and an onlooker videotaped the search. *Id.* at 1142.

Here, Plaintiff went through the medication line in a common area at CRCI, supervised by Joseph. (Joseph Decl. ¶ 7.) As Joseph describes the incident, Plaintiff ignored Joseph's orders that he stick out his tongue so that she could make sure he had taken his medicine. Joseph then observed Plaintiff bring a hand to his mouth and to his pockets. Plaintiff ignored Joseph's orders that he take his hands from his pockets and tuck in his shirt so she could see his pockets. He also ignored a warning that she would request a skin search if he did not comply. Only after all that did Defendant Johnson call for intake staff to skin-search Plaintiff. (Joseph Decl. ¶ 8, Att. 2.)

Thomas Hayes, a CRCI correctional officer, received Joseph's radio call that Plaintiff required a skin search. (Hayes Decl. ¶ 5, Att. 2.) He searched Plaintiff and his clothes in the intake area's center search booth, with the curtain closed. (Hayes Decl. ¶¶ 5-6, Att. 2.) No women were present or within view of Plaintiff during the search. (Hayes Decl. ¶ 6.) When Plaintiff ignored orders to get dressed, Moore intervened and ordered Plaintiff to submit to restraints. (*Id.*) Again, Plaintiff did not comply, so Moore called for first responders. (Hayes Decl. ¶ 7; Lange Decl. Att. 2, at 6.) Siegel, a woman, was on call as a designated first responder. (Hayes Decl. ¶ 7.) She "stood post in the staging area of Intake" and did not enter the search area until called, at which time Plaintiff was partially clothed. (*Id.*; Joseph Decl. ¶¶ 7-8; Lange Decl. Att. 2, at 9.) She did not enter the search booth until Plaintiff "became argumentative and began waving his arms to make his point." (Hayes Decl. ¶ 8.)

The search of Plaintiff was reasonable in light of CRCI's need for the search and Plaintiff's privacy rights. The scope of the intrusion was limited. Plaintiff underwent a visual inspection while undressed, and his clothes were inspected, but he was not physically touched. The manner in which the search was conducted was consistent with OR. ADMIN. R. 291-041-0020, which requires skin searches to be conducted in a private area and by an officer of the same gender as the prisoner, except in emergency situations. (Lange Decl. ¶¶ 9-13, Att. 3, at 6.) The justification for initiating the search was Joseph's reasonable suspicion that Plaintiff had stashed his medication, which "can threaten the safety and security of the institution, and can pose medical risks to inmates who consume the diverted medication." (Joseph Decl. ¶ 7.) Finally, the place in which the search was conducted was the place where all CRCI inmates are searched, a private booth where only the officer performing the search can view the prisoner being searched. (Lange Decl. ¶¶ 15-16, Att. 4.)

All of the *Bell v. Wolfish* factors weigh strongly in favor of reasonableness. Indeed, the search of Plaintiff here was more private than those upheld in *Michenfelder* and *Grummett*. Accordingly, the skin search did not violate Plaintiff's Fourth Amendment right to be free from unreasonable searches.

### b.      Cell Searches by Gushard and Alves

Plaintiff claims that Gushard came to his cell and seized his legal reference books on several occasions. (Johnson Decl. at 19.) Plaintiff further claims that Gushard sent Alves to search his cell and seize legal material. (*Id.*) Even assuming these searches occurred in the "wrongful" manner Plaintiff describes, they do not implicate the Fourth Amendment. The Supreme Court held in 1984 that "prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells."

*Hudson v. Palmer*, 468 U.S. 517, 530 (1984). The Court concluded that its reasoning applied to unreasonable seizures, too: "Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.* at 528, n.8. Thus, Plaintiff cannot establish a Fourth Amendment violation with regard to the search of his cell or seizure therefrom.

Plaintiff also alleges that he caught Alves reading his legal work. (Johnson Decl. at 20.) Such conduct raises an issue under the First Amendment rather than the Fourth Amendment. *Giba v. Cook*, 232 F. Supp. 2d 1171, 1186 (D. Or. 2002) ("[W]hether a prison official can search and read legal materials outside of an inmate's presence is a different question that is more appropriately considered under the First Amendment[.]"). However, the Court declines to engage in that analysis, as Plaintiff has not named Alves as a defendant in this case. To hold Gushard liable for Alves' alleged actions would require "not only . . . some kind of direct personal participation in the deprivation but also . . . setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987). However, Plaintiff has not alleged facts from which the Court could infer such participation by Gushard. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."). Plaintiff's Fourth Amendment claims cannot survive summary judgment.

### 5.     First Amendment Retaliation

Plaintiff asserts a First Amendment retaliation claim "for exercising [his] Fifth and Fourteenth Amendment Rights to Due Process and Equal Protection." (Am. Compl. at 16.) More

specifically, he alleges that he was harassed by ODOC staff for exercising his own right of access to courts and for helping other prisoners with legal research regarding "discriminatory practices implemented by D.O.C. administrators[.]" (Am. Compl. at 8-9.) A First Amendment retaliation claim in the prison context requires five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

### a.    Hust

Plaintiff alleges that Hust deleted legal information from his assigned thumb drive, confirming his suspicion that he was being targeted for harassment in retaliation for his "efforts to assist [his] fellow inmates." (Am. Compl. at 9.) Plaintiff states that he filed a grievance against Hust for deleting items from his thumb drive, which he alleges resulted in further retaliation by Noack and Joseph and harassment by prison guards generally. (Am. Compl. at 9-10.) Hust denies ever speaking to Plaintiff about his thumb drive and denies deleting anything from his thumb drive. (Hust Decl. ¶ 28.) She also denies being notified of a grievance filed by Plaintiff against her, which notification, along with an opportunity to respond, would "[o]rdinarily" follow a grievance. (Hust Decl. ¶ 29.)

To survive Defendants' motion for summary judgment, Plaintiff must "cit[e] to particular parts of materials in the record" to support his assertion "that a fact . . . is genuinely disputed." FED. R. CIV. P. 56(c)(1)(A). Plaintiff has not done so here. In his declaration in support of his amended response (ECF No. 72-1), Plaintiff restates his allegations in a bit more detail than his amended complaint, but does not provide any factual support, nor does he present evidence to

support his statements, such as affidavits of fellow prisoners. Plaintiff alleges that Hust called him to the law library two days after speaking to inmates who filed prison grievances and asked why he needed legal information pertaining to civil rights law on his thumb drive. (Johnson Decl. at 4-5.) He alleges he told Hust that the relevant information was needed "for an imminent court deadline[,]" and Hust responded that he had no right to the information and deleted it. (Johnson Decl. at 5.)

These allegations simply echo those in Plaintiff's amended complaint. (ECF No. 8.) Plaintiff does not provide the dates on which these alleged events occurred so that the Court could infer causation. He does not describe what documents were deleted from the thumb drive so that the Court may assess whether they were in compliance with prison policy regarding thumb drives, *i.e.*, whether Hust actually took an adverse action by deleting them and whether Plaintiff's rights were chilled by the deletion. Such "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997.)

### b.     Noack

Plaintiff's retaliation claim against Noack is based on three alleged incidents: (1) Noack called Plaintiff to her office after he filed the grievance against Hust, told him he had no legal rights while in custody, and refused to give him a copy of his grievance form, which incident was followed by general harassment by correctional staff; (2) Noack visited Plaintiff's cell and told him he was being transferred because he "was a problem"; and (3) Noack made "libelous and derogatory comments" that were "disseminated throughout the interagency email system,"

resulting in Plaintiff being "'black balled' from being transferred to a proper facility." (Am. Compl. at 9-12.)

Noack denies meeting with Plaintiff and discussing his grievance. That is the role of the CRCI Grievance Coordinator. (Noack Decl. ¶ 5.) Furthermore, she presents evidence of Plaintiff's grievance history, showing that he filed only one grievance while incarcerated, which grievance was regarding a CPAP machine and not against Noack. (Noack Decl. Att. 2.) As for Plaintiff's transfer to OSP, Noack states that MDT met on January 15 and January 22, 2015, "to review the status of all inmates in CRCI's special housing." (Noack Decl. ¶¶ 17-18.) Ultimately OPM approved Plaintiff's transfer to OSP. (Noack Decl. ¶ 19.) Noack states that she was not involved in either MDT's or OPM's "consideration or decisions" to transfer Plaintiff. (Noack Decl. ¶ 20.) As for Plaintiff's allegation that Noack told him he was being transferred because he was a problem, Noack states that she does "not recall ever meeting or discussion with Inmate Johnson on any matter[.]" (Noack Decl. ¶ 5.)

In his opposition (ECF Nos. 72 & 72-1), Plaintiff simply restates the allegations in his amended complaint regarding the grievance. He offers nothing to controvert ODOC's record of his grievance history, which contains no grievance against Hust or Noack. Accordingly, there is no issue of material fact as to Plaintiff's grievance-based retaliation claim against Noack.

As for Plaintiff's other allegations, Plaintiff claims that Noack was "the only high-ranking official present and waiting outside the prison" when Plaintiff arrived back from Multnomah County. (Johnson Decl. at 13.) He claims that she was in discussion with one of the transport deputies, called a nurse to address Plaintiff's injuries, ordered the guards present to take Plaintiff to solitary confinement, and later "disseminated a false account of the incident to other prison staff" in an effort to have Plaintiff transferred to another facility. (Johnson Decl. at 13,

15.) However, Noack was not on shift on January 14, 2015, when Plaintiff returned to CRCI. (Noack Decl. ¶ 15; *see also* Defs.' Reply Supp. Mot. Summ. J. (ECF No. 76 at 12, n.4) (stating that Lieutenant Sean Johnson was on shift, not Noack)).

Plaintiff claims that these additional allegations would be corroborated by a video recording taken by a corrections officer had the recording been produced in discovery, as requested. (Johnson Decl. at 13.) However, even assuming that Plaintiff's additional allegations are true, they would only support the first element of a retaliation claim: adverse action by the defendant. Plaintiff fails to demonstrate any causal connection between that adverse action and his protected conduct. His allegation that Noack's actions followed his grievance against Hust is directly contradicted by his prison grievance record and improperly relies on the logical fallacy of *post hoc, ergo propter hoc* (after this, therefore because of this). *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (refusing to find a nexus between adverse action and protected conduct based on such false logic). Furthermore, Plaintiff does not assert that Noack's alleged actions chilled the exercise of his First Amendment rights or that they failed to further a legitimate correctional goal. Noack is entitled to summary judgment.

### c.      Joseph

Plaintiff alleges that Joseph "attempted to incite a[n] incident of misconduct and when [he] did not react to the mistreatment" Joseph falsely alleged that Plaintiff attempted to conceal medication, resulting in a strip search. (Am. Compl. at 10; Johnson Decl. at 6.) On December 5, 2014, Joseph supervised CRCI's medication line, where one of her duties was to ensure that prisoners took their medication rather than store it to barter or stash later. (Joseph Decl. ¶ 7.) She states that Plaintiff only lifted up his tongue after several orders, brought a hand to his mouth and then to his pocket, and then repeatedly refused her orders to remove his hand from his pocket and

tuck in his shirt. Only then did she order a skin search of Plaintiff. (Joseph Decl. ¶ 8.) Further, she states that she did not issue a misconduct report or take any other disciplinary action but that she did submit a memo describing the incident to the Shift Lieutenant. (Joseph Decl. ¶ 9.) That memo's description of the incident is consistent with Joseph's declaration. (Joseph Decl. Att. 2.)

Plaintiff insists that his description of the skin search incident would be proven correct by video surveillance, had the recording been produced in discovery as requested. (Johnson Decl. at 6.) However, assuming Plaintiff's version of events is true would only create a factual dispute as to the adverse action element of a First Amendment retaliation claim. As with his claim against Noack, Plaintiff draws no causal connection between Joseph's alleged actions and his own protected conduct, and he provides no basis for his belief that Joseph was not acting to promote the legitimate correctional goal of preventing the stashing or bartering of medicine. The closest he comes is in stating that Joseph "did not treat the last two inmates before me the same way" and that Joseph's "false actions and harsh tone of voice toward me was indicative of the same staff harassment that I had been previously subjected to[] . . . ." (Johnson Decl. at 7-8.) These are not "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Such "mere assertions" of "discriminatory motivation . . . [are] inadequate, without substantial factual evidence, to raise an issue precluding summary judgment." *Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1983).

### d.    Gushard

Plaintiff claims that Gushard refused to deviate from the prison's "unconstitutional" policy (presumably regarding what legal material may be saved on prisoners' thumb drives), reprimanded Plaintiff for requesting the material, then accosted him and "physically grabbed [him] by the throat while threatening to inflict corporal punishment." (Am. Compl. at 14.) Next,

Plaintiff claims that Gushard "sent a fellow correctional officer to [his] cell to seize [his] legal reference books and . . . legal documents." (Am. Compl. at 15.) Plaintiff identifies that correctional officer as Alves in his declaration. (Johnson Decl. at 19-20.) Plaintiff also claims Gushard himself came to his cell to seize his legal reference books "on several occasions[]" and that the books were not overdue. (Johnson Decl. at 19.)

Gushard denies the alleged physical assault, denies editing, modifying, or deleting legal material from Plaintiff's thumb drive, and denies sending another officer to search Plaintiff's cell. (Gushard Decl. ¶¶ 20-25.) Gushard admits retrieving books from Plaintiff's cell, but only after sending Plaintiff "several notices" that the books were overdue. (Gushard Decl. ¶ 22.)

Even assuming Plaintiff's version of events is true, Plaintiff cannot survive the motion for summary judgment on his First Amendment retaliation claim against Gushard because he fails to identify any protected conduct. With regard to the legal material stored on his thumb drive, Plaintiff acknowledges that he asked Gushard to "deviate" from prison policy. (Am. Compl. at 14.) The OSCI Law Library ESD Usage Agreement states the rules for using the OSCI law library's thumb drives, including what constitutes a legal document authorized to be saved to a thumb drive under OR. ADMIN. R. 291-139-0110(10). (Gushard Decl. Att. 5.) Plaintiff signed the agreement, thereby agreeing to follow the rules therein and acknowledging that he understood that non-compliance may result in disciplinary measures.[13] (Id. at 4.) Using the law library's thumb drives for unauthorized purposes under the agreement is not protected conduct under the First Amendment. To be sure, access to courts "is subsumed under the First Amendment right to petition the government for redress of grievances." Perry, 1994 WL 374551, at *2. However, as

_____

[13] Plaintiff attempted to add to the list of authorized Legal Documents, which addition Gushard crossed out and noted next to his initials "cannot write in your own purposes[.]" (Id. at 2.)

previously discussed, limiting the uses of law library word processors and thumb drives did not violate Plaintiff's right of access to courts, nor did limiting the books Plaintiff could store in his cell. Thus, Plaintiff identifies no protected conduct prompting Defendant's purported retaliation, and his retaliation claim therefore must fail.

All Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claims. To the extent that Plaintiff disputes the constitutionality of ODOC policies governing inmate access to law libraries and legal materials, any such claims are moot because Plaintiff is no longer in ODOC custody.

### 6.      Equal Protection

Plaintiff also asserts that he was denied the equal protection of the laws, as prohibited by the Fourteenth Amendment. (Am. Compl. at 17.) "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Plaintiff makes a few passing references to race in his amended complaint. For example, he lists "racial segregation" as one of the "injustices [he] endured" while in ODOC's custody. (Am. Comp. at 16.) The closest Plaintiff comes to alleging discrimination based on race is his allegation that he was singled out and harassed for assisting "fellow minority inmates" with "researching legal remedies to seek redress for ongoing and widespread discriminatory practices implemented by D.O.C. administrators." (Am. Compl. at 9.) However, reading Plaintiff's amended complaint as a whole makes clear that Defendants' alleged motivation for their purported harassment was not racism but preventing Plaintiff from providing legal assistance as proscribed by ODOC policy.

Furthermore, even if the Court were to interpret the above allegation to be one of race-based discrimination, Plaintiff has not met his summary judgment burden of demonstrating a factual dispute on the issue. "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. In his opposition (ECF Nos. 72 & 72-1), Plaintiff never mentions race or any other protected class, and "equal protection" is only mentioned in a heading. (ECF No. 72 at 9.) Thus, Plaintiff is resting on his pleadings, which is insufficient to survive a motion for summary judgment. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (refusing to "manufacture arguments for an appellant" where many other issues were presented).

As an alternative to the above class-based equal protection theory, under the so-called "class of one" theory, Plaintiff could state an equal protection claim by alleging that Defendants "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff does, in fact, allege disparate treatment by Defendants. As discussed above, Plaintiff alleges being harassed for helping other prisoners with their legal work, which, were other prisoners allowed to do the same, would amount to disparate treatment. In response, Hust states that "[o]nly an inmate legal assistant is authorized to assist another inmate with legal work, and Inmate Johnson was not an inmate legal assistant." (Hust Decl. ¶ 8.) In support, Hust attaches OR. ADMIN. R. 291-139-0010 and OR. ADMIN. R. 291-139-0015, defining "Legal Assistant" and delineating library procedures. (Hust Decl. Att. 2.) The reasoning behind the policy against allowing all prisoners to assist one another with legal work is that "inmates often want to be paid

for that service . . . which can subject inmates to coercion, retaliation, or other security risks."

(Hust Decl. ¶ 11.)

Plaintiff "must present affirmative evidence in order to defeat [such] a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In his declaration in support of his amended response, Plaintiff states that prisoners helping one another with their legal work is "common" and that "the librarian allowed this activity[.]" (Johnson Decl. at 3.) He maintains that the only restriction is getting compensated for such help. (Johnson Decl. at 4.) Those are not specific facts sufficient to show a factual dispute as to disparate treatment. Plaintiff is improperly resting on his pleadings. Furthermore, he fails to address the remaining elements: intentionality and a lack of a rational basis for the disparate treatment. Therefore, Plaintiff has not met his burden of demonstrating that a genuine factual dispute exists, and Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

### 7. Qualified Immunity

Plaintiff has not met his burden as to any of his § 1983 claims. Even if he had, Plaintiff has not addressed the issue of qualified immunity with respect to any of his claims. He does not attempt to establish that the rights at issue were clearly established such that Defendants understood the unlawfulness of their actions. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011) ("Qualified immunity shields federal and state officials from money damages unless a

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct[.]") (citation and internal quotation mark omitted). Proving that the right at issue is clearly established is the plaintiff's initial burden to bear. *Sweaney v. Ada Cty., Idaho*, 119 F.3d 1385, 1388 (9th Cir. 1997). Plaintiff has not met his burden here.

    **B.**     **42 U.S.C. §§ 1985 & 1986 Claims**

    Plaintiff states without elaboration that "[t]he facts stated are sufficient to state a claim for violations of 42 U.S.C. Section 1985/1986/1988." (Am. Compl. at 17.) To state a claim under 42 U.S.C. § 1985, Plaintiff must allege that Defendants conspired in order to deprive Plaintiff of the equal protection of the laws or of equal privileges and immunities under the laws. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Furthermore, Plaintiff must allege that Defendants acted in furtherance of the conspiracy, thus injuring Plaintiff's person or property or depriving Plaintiff of a right or privilege of U.S. citizenship. *Id.* at 103. Further still, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 102.

    Plaintiff alleges that he was "maliciously harassed, physically threatened and punished[] simply because [he] exercised [his] fundamental right to access to courts." (Am. Compl. at 8.) He alleges that such harassment by "D.O.C. administrators" began shortly after he started assisting other prisoners with their legal matters (Am. Compl. at 9) and provides specific examples as to each Defendant's actions. As to specific harm, Plaintiff alleges loss of his parental rights and denial of his petition for post-conviction relief due to untimeliness. (Am. Compl. at 17.)

Where Plaintiff fails, however, is in alleging a discriminatory animus, such as race or class, behind the Defendants' purported conspiracy. He instead alleges that Defendants' motivation was preventing his access to the courts. "Whatever may be the precise meaning of a 'class' for purposes of . . . § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993). Defendants' alleged animus toward prisoners seeking access to courts does not place Plaintiff in a qualifying class for purposes of § 1985(3). Accordingly, Defendants are entitled to summary judgment on both the § 1985 and § 1986 claims. *See Trerice v. Pedersen*, 769 F.2d 1398, 1403 (9th Cir. 1985) (following "the broadly accepted principle that a cause of action is not provided under 42 U.S.C. § 1986 absent a valid claim for relief under section 1985").[14]

## C. State Law Claims

In addition to his federal law claims, Plaintiff alleges tort claims under state law, including negligence, invasion of privacy, defamation, and breach of fiduciary duty. (Am. Compl. at 17.) However, "the sole cause of action for a tort committed by officers, employees, or agents of a public body acting within the scope of their employment or duties . . . is an action against the public body." OR. REV. STAT. § 30.265(3). In such an action, where the plaintiff alleges damages in an amount less than or equal to those provided by OR. REV. STAT. §§ 30.271-30.273, the Court will "substitute the public body as the defendant." *Id.* In this case, Plaintiff alleges $200,000 in compensatory damages and an unspecified amount of punitive damages, well under the applicable multi-million dollar limits provided in OR. REV. STAT. § 30.271.

---

[14] Plaintiff is not entitled to attorney's fees under 42 U.S.C. § 1988(b), because he is not a prevailing party and because § 1988 does not apply to self-represented litigants. *Kay v. Ehrler*, 499 U.S. 432, 437-38 (1991).

Furthermore, the torts Plaintiff alleges Defendants committed all involved Defendants "acting within the scope of their employment or duties."

Pursuant to OR. REV. STAT. § 30.265(3), the Court substitutes the State of Oregon as the proper defendant for Plaintiff's state law claims. Because sovereign immunity deprives this Court of jurisdiction to adjudicate the state law claims, the Court dismisses the state law claims against the State of Oregon. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 44 (1996) ("The Eleventh Amendment presupposes that each State is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without a State's consent.") (citation, quotation marks, and brackets omitted). Dismissal is without prejudice to Plaintiff's right to pursue the claims in state court.

### D.    Other Pending Motions

Plaintiff filed a motion to compel production of documents (ECF No. 53). Defendants opposed the motion on the ground that Plaintiff's discovery requests were untimely and impermissibly vague, but Defendants have nevertheless produced all documents regarding Plaintiff's grievance and disciplinary history. (Defs.' Resp. at 7.) In light of Plaintiff's self-represented status, the Court delayed ruling on Plaintiff's motion pending the Court's consideration of the pending motion for summary judgment to determine if Plaintiff has identified any additional discovery he needed to support his opposition to the pending motion.

Plaintiff notes in his opposition only that security camera footage from the skin search incident and the Multnomah County transport incident would prove his account of those incidents. (Johnson Decl. at 7.) He does not identify any documents or any other materials that were not produced in discovery that were necessary to respond to the pending motion for summary judgment.

As an initial matter, it is doubtful that surveillance footage of either incident remains available, in light of the fact that the events occurred in late 2014 and early 2015, and Plaintiff did not submit a grievance or a contemporaneous complaint relating to either event to trigger preservation. In any event, as discussed above, the requested surveillance discovery would not have altered the Court's analysis herein, even if Plaintiff had timely requested such discovery.

In addition, Plaintiff filed an amended response to the pending motion for summary judgment and styled it as a motion to amend/correct. (ECF No. 72.) The Court hereby GRANTS Plaintiff's motion to amend his response and has considered the amended response herein.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (ECF No. 54); DENIES Plaintiff's motion to compel production of documents (ECF No. 53); and GRANTS Plaintiff's Motion to Amend/Correct (ECF No. 72).

**IT IS SO ORDERED.**

DATED this 6th day of July, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge